UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO. 1:20-MJ-0589-DML |
| | ) | |
| KAIKAI ZHAO, | ) | -01 |
| | ) | |
| Defendant. | ) | |

GOVERNMENT'S MOTION FOR PRE-TRIAL
DETENTION PURSUANT TO 18 U.S.C. § 3142

The United States of America ("the government") files this motion seeking the pre-trial detention of defendant Kaikai Zhao ("Zhao"), pursuant to 18 U.S.C. § 3142(e) and (f), as the defendant poses a danger to the community if released and there is a serious risk that defendant will flee.

**I.      The Law**

A defendant is eligible for detention upon motion of the attorney for the Government, in a case that involves a crime of violence, 18 U.S.C. § 3142(f)(1)(A), and/or upon a motion by the United States or the Court *sua sponte*, in cases involving (1) a serious risk that the person will flee or (2) a serious risk that the defendant will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, a prospective witness or juror.    18 U.S.C. § 3142(f)(2).    *United States v. Sloan*, 820 F.Supp. 1133, 1135-36 (S.D. Ind. 1993).    The existence of those conditions triggers the detention hearing which is a prerequisite for an order of pretrial detention.    18 U.S.C. § 3142(e).    The judicial officer determines the existence of these conditions by a preponderance

of the evidence. *United States v. Friedman*, 837 F.2d 48, 49 (2nd Cir. 1988).

In this case, the United States moves for detention pursuant to 18 U.S.C. §§ 3142(e), (f)(1) and (f)(2). Once it is determined that a defendant qualifies under any of the ten conditions of § 3142(f), the court may order a defendant detained before trial if the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community. 18 U.S.C. § 3142(e). Detention may be based on a showing of either dangerousness or risk of flight; proof of both is not required. *United States v. Fortna*, 769 F.2d 243, 249 (5th Cir. 1985).

With respect to reasonably assuring the appearance of the defendant, the United States bears the burden of proof by a preponderance of the evidence. *United States v. Portes*, 786 F.2d 758, 765 (7th Cir. 1985); *United States v. Himler*, 797 F.2d 156, 161 (3rd Cir. 1986); *United States v. Vortis*, 785 F.2d 327, 328-29 (D.C. Cir.), *cert. denied*, 479 U.S. 841, 107 S.Ct. 148, 93 L.Ed.2d 89 (1986); *Fortna*, 769 F.2d at 250; *United States v. Chimurenga*, 760 F.2d 400, 405-06 (2nd Cir. 1985); *United States v. Orta*, 760 F.2d 887, 891 & n. 20 (8th Cir. 1985); *United States v. Leibowitz*, 652 F.Supp. 591, 596 (N.D. Ind. 1987). With respect to reasonably assuring the safety of any other person and the community, the United States bears the burden of proving its allegations by clear and convincing evidence. 18 U.S.C. § 3142(f); *United States v. Salerno*, 481 U.S. 739, 742, 107 S.Ct. 2095, 2099, 95 L.Ed.2d 697 (1987); *Portes*, 786 F.2d at 764; *Orta*, 760 F.2d at 891 & n. 18; *Leibowitz*, 652 F.Supp. at 596; *United States v. Knight*, 636 F.Supp. 1462, 1465 (S.D. Fla. 1986). Clear and convincing evidence is something more than a preponderance of the evidence but less than proof beyond a reasonable doubt. *Addington v. Texas*, 441 U.S. 418, 431-33, 99 S.Ct. 1804, 1812-13, 60 L.Ed.2d 323 (1979).

The legislative history of the Bail Reform Act of 1984 makes clear that Congress intended that the "safety of the community" language in Section 3142 was to be given a broad construction. *See S*. Rep. No. 225, 98th Cong., 1st Sess. 12 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3195 ("The reference to safety of any other person is intended to cover the situation in which the safety of a particular identifiable individual, perhaps a victim or witness, is of concern, while the language referring to the safety of the community refers to the danger that the defendant might engage in criminal activity to the detriment of the community. *The Committee intends that the concern about safety be given a broader construction than merely danger of harm involving physical violence.")* (emphasis added). Courts have, therefore, appropriately construed the statute to find that protection of the community from economic harm is a valid objective of bail conditions. See *United States* v. *Schenberger,* 498 F. Supp. 2d 738, 742 (D.N.J. 2007) (holding that "[a] danger to the community does not only include physical harm or violent behavior" and citing the Senate Committee Report language reproduced above); *United States* v. *Gentry,* 455 F. Supp. 2d 1018, 1032 (D. Ariz. 2006) (in a fraud and money laundering case, in determining whether pretrial detention was appropriate, the court held that danger to the community under Section 3142(g) "may be assessed in terms other than the use of force or violence ... [including] economic danger to the community"); *United States* v. *Provenzano,* 605 F.2d 85, 95 (3rd Cir. 1979) (in a pre-1984 Bail Reform Act case, post-conviction, the Court rejected an application for bail finding that "danger to the community" is not limited to harms involving violence).

3

## II.        Allegations Underlying the Indictment

Kaikai ZHAO ("ZHAO") is a citizen of the People's Republic of Chinese ("PRC") who applied for a United States Non-Immigrant Visa ("NIV") in June 2018 and was issued an F1 Visa for a PhD program studying machine learning and artificial intelligence at Indiana University (IU) in Bloomington, Indiana.   In his visa application, ZHAO answered "No" to the question "Have you ever served in the military?"

As outlined in greater detail in the criminal complaint, the FBI subsequently uncovered information establishing that ZHAO had, in fact, served in the PRC's People's Liberation Army ("PLA").   That information included, among other things, the discovery of a picture of ZHAO in a PLA Air Force uniform associated with a published article on air combat radar technology.

As part of its investigation into this matter, the FBI placed ZHAO under physical surveillance to confirm, among other things, where he was living in Bloomington.  On July 17, 2020, the FBI surveillance team observed ZHAO meeting in Bloomington with two officials from the PRC Chicago Consulate in a public park close to ZHAO's residence.   That meeting was significant to the FBI, as ZHAO's visa application is one of several PRC/PLA member visa applications under scrutiny by the FBI, and, as outlined below, by July 17 a number of other PLA members had already been apprehended and/or charged with visa fraud in other parts of the country.   The meeting between ZHAO and Consulate officials lasted approximately forty-five minutes, after which the PRC Consulate officials departed.

The FBI subsequently conferred with the U.S. Department of State, Office of Foreign Missions ("OFM"), on the observed visit between ZHAO and PRC Chicago Consulate

officials.  Agents learned that when consulate staff travel beyond 25 miles from the consulate by car, they are required to file a Travel Notification form with OFM outlining their destination, route of travel, the reason for the trip, the identities of all consulate staff who will be traveling and the identities of those whom they will be meeting with at their destination.  In this instance, the PRC Chicago Consulate notified OFM that four people, including at least one Consul and one Vice Consul, would be traveling from the Consulate to Bloomington on July 17, 2020, to meet with a female (presumably a student) at a residential address on the east side of Bloomington.  A meeting with ZHAO was not mentioned in the Consulate's notice to OFM, and the address provided in the notification to OFM is approximately 4.5 miles away from where ZHAO was residing.  The notification further indicated the Consulate staff intended to spend 30 minutes at the specific address in Bloomington, before departing for another 30 minute visit in northern Indiana and ultimately returning to Chicago.  The consulate further notified OFM that the purpose of the trip was to provide health packages (masks and wipes) to Chinese students.

On July 18, 2020, a federal search warrant was executed at ZHAO's residence in Bloomington.   Pursuant to that warrant, FBI agents recovered a number of electronic devices and documents.   In a trash can next to ZHAO's bed, Agents also discovered and seized documents that appeared to have been recently ripped up by hand and discarded.   Agents were subsequently able to reconstruct those documents, and determined that it was a printed copy of ZHAO's Online Non-Immigrant Visa Application, Department of State Form 160 (DS-160).   It appears that the document was printed out on June 25, 2018, and included a map to the U.S. Embassy in Beijing.   The map was also torn up and discarded in trash can next to ZHAO's bed.

The DS-160 indicates that ZHAO had a consular appointment at the U.S. Embassy in Beijing on June 27, 2018, ostensibly concerning his visa application. During the course of the search agents also noted that ZHAO appeared to be living out of an open suitcase on the floor of his bedroom, with clothing in the suitcase and stacked nearby.

Once the residence was secured, ZHAO was taken into custody on the criminal complaint and transported to the FBI's Bloomington office. There, ZHAO consented to an interview with agents. During the interview of ZHAO denied that he had ever served in PLA Air Force. When asked about the picture of him wearing a PLA Air Force uniform, ZHAO acknowledged that he was pictured wearing an actual PLA Air Force uniform, but claimed a co-author of the article had given him the uniform to wear for a picture in an effort to raise the prestige of the paper and the school he was attending at the time. ZHAO also repeatedly denied being visited by officials from the PRC Chicago Consulate the day before. It was not until agents confronted ZHAO with the fact that the meeting had been observed by an FBI surveillance team that ZHAO conceded that he had, in fact, met with officials from the PRC consulate the day before. When asked what the purpose of the meeting was, ZHAO pointed to visa documents on the table that agents had previously shown him and explained the consulate officials told him the U.S. government might contact him (ZHAO) because of his military background and experiences at the schools ZHAO attended, or words to that effect. ZHAO also told agents that embassy officials had given him a small bag containing snacks and face masks.[1] During the interview

---

[1] The bag ZHAO was given by embassy officials was located in his residence. Agents noted that the bag and its contents would have easily fit in a standard mailing or shipping package. Agents also noted that the trip from the PRC consulate in Chicago to Bloomington was approximately 246 miles and would have taken more than 4 hours.

ZHAO also told agents that his family was poor and from a small rural community in China. That background information is at odds with information gathered during the visa application process, where U.S. Embassy officials noted that ZHAO's family was affluent and could afford to pay for the cost of ZHAO's education at IU.

Following the search of Zhao's residence, the FBI executed a second search warrant at the workspace ZHAO occupied in Luddy Hall at Indiana University. The FBI has now begun the process of forensically examining several electronic devices found in Zhao's residence and workspace, to include computers, tablets, and smart phones. While that process is far from completion, an initial examination of ZHAO's phone revealed that ZHAO appears to have deleted nearly all content from the WeChat application on his phone prior to approximately July 11, 2020. Agents also located a blank military benefits form along with other military related documents and photos on ZHAO's iPad, although more time is needed to assess the relevance (if any) of those materials. Additionally, agents have located a photo of ZHAO playing soccer for Aviation University of Air Force ("AUAF")[2] on one of ZHAO's phones. The photo appears to be from November of 2014, the year after ZHAO stated he graduated from AUAF.

**III.     Other Relevant Background**

As noted above, ZHAO's visa application is one of several that has come under scrutiny during a national FBI investigation into visa fraud by members of the PLA. Indeed, the FBI's investigation has revealed that ZHAO's case is not an isolated one, but instead appears to be part of a program conducted by the PLA—and/or associated institutions—to send military scientists

---

[2] As noted in the criminal complaint, Aviation University of Air Force is the PRC's equivalent of the U.S. Air Force Academy.

7

to the United States on false pretenses with false covers or false statements about their true employment.   There exists evidence in at least one of these cases of a military scientist copying or stealing information from American institutions at the direction of military superiors in China.  There additionally exists evidence of the PRC government instructing these individuals to destroy evidence and in coordinating efforts regarding the departure of these individuals from the United States, particularly following the charges filed against Xin Wang in U.S. District Court for the Northern District of California on June 7, 2020.

The government proffers the below information regarding because the similarities between these cases and that of ZHAO provide a fuller record and context to the Court of facts relevant to ZHAO's detention.

    A.     Chen Song

Chen Song ("Song") applied for and received a J-1 visa to enter the United States in November 2018, with the stated purpose of conducting research at Stanford University ("Stanford").   On her visa application, under penalty of perjury, Song stated that her military service had ended in 2011, when she graduated from the Fourth Military Medical University ("FMMU"), which is subordinate to the Air Force component of the PLA.   Song also stated that her employer at the time of her visa application was Xi Diaoyutai Hospital at No. 30 Fucheng Road in Beijing.   On December 23, 2018, Song was admitted to the United States on a J-1 visa, and she subsequently began work at Stanford University ("Stanford"), conducting neurological research.

Following Song's admission to the United States, the FBI developed information that she was, in fact, still a PLA member, and was in the United States on false pretenses.   Specifically, the FBI identified from open sources both a photograph of Song in the uniform of the Civilian

Cadre of the PLA,[3] and publications in which Song described her institutional affiliation with the PLA Air Force General Hospital and FMMU.

On July 13, 2020, Song was voluntarily interviewed by the FBI in conjunction with the execution of a search warrant at her residence in California. During the course of that interview, Song adamantly denied a continuing affiliation with the PLA beyond the 2011 date she noted in her visa application. When asked about the multiple research articles published in conjunction with PLA institutions after that 2011 date, Song claimed that one 2012 article was due to a delay in publication but refused to explain how more recent articles came to be published despite her professed lack of affiliation with the PLA.

Following that interview, the FBI conducted a forensic examination of Song's computer and recovered a folder, deleted from Song's hard drive on June 21, 2020, named, "2018 Visiting School Important Information," in Chinese. In that folder FBI agents recovered a letter from Song to the Education Section within the PRC Consulate in New York, explaining that Song was seeking authorization from the PLA Air Force and FMMU to stay in the United States for another year. Song wrote that the employer listed in her visa application, Beijing Xi Diaoyutai Hospital, was a false front, and that she had obtained approval for her extension from both the PLA Air Force and FMMU to extend her stay. Song further explained that the PLA Air Force and FMMU approval documents were classified so she was not able to transmit them to the PRC New York Consulate online, but instead was attempting to ship the documents via UPS.

Also recovered from the same deleted folder were an image of Song's PLA credentials, covering the period July 2016 to July 2020 issued by the Air Force General Hospital Political Department, which included a photograph of Song in military uniform and referencing her

---

[3] According to the Ministry of National Defense of the People's Republic of China, found at http://www.mod.gov.cn/policy/2009-07/14/content_3100988.htm, Civilian Cadres of the People's Liberation Army are active military personnel who have been appointed to junior professional technical positions or clerical ranks and above. The FBI has assessed that members of the Civilian Cadre are active military personnel.

department as the Air Force General Hospital and rank of Civilian Cadre Level 5. A resume for Song, which included a photograph of Song in uniform and lists her employer from September 2011 to the present as the Department of Neurology, Air Force General Hospital, was also found in that folder.

  B. *Xin Wang*

  Xin Wang ("Wang") is a Chinese national who was in the United States on a J-1 visa. On June 7, 2020, Wang was arrested at Los Angeles International Airport ("LAX") while attempting to depart the United States for China. Wang was subsequently indicted in the Northern District of California on visa fraud charges.

  According to court filings in that case, Wang was a researcher at the University of California, San Francisco ("UCSF"). Wang's J-1 visa application stated he had been affiliated with FMMU and that his military service in China had ended in 2016. In or around May 2020, Wang informed his supervising professor at UCSF that his employer, FMMU, had recalled him and 16 similarly employed colleagues in the United States back to China. On June 7, 2020, Wang was interviewed by United States Customs and Border Patrol ("CBP") officials at Los Angeles International Airport as he attempted to leave the United States. During that interview, Wang was initially evasive, but subsequently admitted that he was, in fact, an active duty member in the PLA, at a level that roughly corresponded with the rank of Major in the United States Army. Wang further admitted that he was employed by FMMU, which is subordinate to the Air Force branch of the PLA. Wang told CBP he intentionally lied on his visa application to increase the likelihood of receiving a visa, and that he was instructed by his supervisor in China, the director of the FMMU lab at which he worked, to observe and document the layout of

the UCSF lab to replicate it when he returned to China. Wang admitted he had deleted all of his WeChat messaging content from his personal mobile phone before arriving at LAX. A subsequent search of Wang's electronic devices uncovered scientific studies from UCSF, which Wang said he planned to share with his PLA colleagues upon his return to the PRC. Wang also admitted he had previously emailed UCSF research to his PLA laboratory.

    C.    *Juan Tang*

Juan Tang ("Tang") is a Chinese national who applied for a United States Non-Immigrant Visa on or about October 28, 2019. Tang was issued a J-l visa on or about November 5, 2019. Department of State records reflect that Tang intended to conduct research at the University of California, Davis ("UCD"), and study cancer treatment methods. On or about December 27, 2019, Tang entered the United States through San Francisco International Airport.

According to the facts in the criminal complaint,[4] Tang was a researcher at the University of California, Davis ("UCD"). In her J-1 visa application, Tang stated she had never served in the military. The FBI's open source investigation, however, revealed photographs of Tang in the uniform of the Civilian Cadre of the PLA, and additional information revealed that Tang had been employed as a researcher at the Air Force Military Medical University, another name for FMMU.

On June 20, 2020, Tang was interviewed by the FBI. Tang denied serving in the Chinese military, and claimed she did not know the meaning of the insignia on her uniform she was pictured wearing. Tang told agents that wearing a military uniform was required for attendance at FMMU because it was a military school. Contemporaneous with Tang's

---

[4] U.S. District Court, Eastern District of California, 2:20-MJ-0096-DB

interview, FBI agents executed a search warrant at her residence, but Tang was not arrested at the conclusion of the search and interview. The FBI's subsequent forensic review of the electronic media taken from Tang's residence uncovered further evidence of her PLA affiliation. After obtaining a criminal complaint and arrest warrant for Tang, the FBI returned to arrest her but could not locate her. Eventually, the FBI determined that, at some point following the search and interview of Tang on June 20, 2020, Tang went to the Chinese Consulate in San Francisco, where she remained for approximately a month. Tang was arrested by the FBI after an FBI surveillance team observed her leaving the San Francisco consulate on or about July 23, 2020, to receive medical treatment.

   D.  L.T.

Like Wang and Tang, L.T. was a Chinese national who entered the United States on a J-1 visa. L.T. entered the United States in February of 2019, and was conducting research at Duke University. On July 12, 2020, L.T. was interviewed by CBP at LAX while attempting to depart the United States. L.T. was initially evasive during the interview, but ultimately admitted that she was affiliated with the PLA General Hospital and PLA Medical Academy. L.T. further stated that she had been contacted by the Chinese embassy on or around July 4, 2020, and was instructed to visit the Department of Education at the embassy. While at the embassy, L.T. and four other students met with a man they called, "the teacher." L.T. stated that the man spoke to them about how to apply for a visa extension and COVID-19 precautionary measures, and instructed them to delete or reset all their electronic media prior to departing the United States because U.S. Customs officers would be interviewing them before they boarded the plane. L.T. further stated that, in July 2020, she spoke with a woman at the Chinese embassy who controlled the China Scholarship Council fund. The woman offered to help L.T. receive a stipend from the scholarship that would pay for L.T.'s flight back to China. According to L.T., when she arrived at LAX for her flight back to China, Xiamen Airlines personnel told her that CBP was

going to be interviewing her, and instructed her to wipe her devices. L.T. told CBP officers that she then used WeChat to call her contact at the embassy, who advised her to stay calm, delete her phone, and answer CBP's questions.

## IV. ARGUMENT

Under 18 U.S.C. § 3142(e)(1) it is clear that ZHAO presents a serious risk of flight and there are no conditions or combination of conditions that can assure his appearance at future proceedings in this case. He therefore should be detained.

Simply put, the defendant gained entry to the United States to engage in scientific research based on intentionally false statements, made under oath, about his affiliation with the PRC military. He operated clandestinely in the United States, along with apparently several (if not more) of his colleagues. As the visit from the PRC consulate to Bloomington and the statements and evidence gathered by the FBI in similar cases currently charged in other districts demonstrate, the defendants in these cases are operating in the U.S. with the knowledge and support of their government. ZHAO has already demonstrated operational sophistication by deleting materials from his electronic devices and repeatedly making demonstrably false statements to the FBI about his contacts with the PRC consulate.

A PRC military official acting with the support of their government has the resources and ability to flee from the United States regardless of any restrictions this Court could impose. This is true as a general matter, but is underscored by the evidence, stemming from extremely similar cases, of a coordinated and aggressive response of the Chinese government to law enforcement activity by the United States government. Specifically, as the Wang case and the L.T. case demonstrate, the Chinese government has instructed PLA members in the United States to obstruct justice by deleting information from their devices. As this case demonstrates, ZHAO has, in fact, done just that. As the Tang case demonstrates, the Chinese consulates in the United States provide a potential safe harbor for a PLA officials intent on avoiding prosecution in this

13

country.   And as the Wang, Tang, and L.T. cases all demonstrate, the PRC government is intent on protecting its officials from prosecution in the United States.   That the FBI has ZHAO's passport is of no relevance when the PRC can easily issue a new one, and when it is up to the airlines to decide whether to require a passport on departure.   That is especially noteworthy in the context of the PRC-based airlines that told L.T. to wipe her phone at the aiport and warned her that she would be interviewed by CBP prior to departure.

       The PRC has demonstrated every reason to assist ZHAO in fleeing the United States and has at its disposal means such as active consular and intelligence services, the ability to issue passports, and state-controlled air transport.   In addition to an obvious interest in securing the return of a PLA officer, defendant's successful flight from the United States would bolster the PRC's information collection activities in the United States, while undermining the ability of the American criminal justice system to deter the illegal conduct of foreign governments in the United States.

       ZHAO's risk of flight in this case could hardly be greater.   He has zero ties to the United States, and could leave the United States at any time without sacrificing anything.   Thus, there is a high likelihood that defendant will successfully flee the United States if released on bond and there are no conditions of release that could ensure his appearance at future proceedings.

## IV. CONCLUSION

For the foregoing reasons, the government respectfully requests that this Court order ZHAO detained, without bond, until this case is resolved.

                                  Respectfully submitted,

                                  JOSH J. MINKLER
                                  United States Attorney

By:     __S:/ Matthew J. Rinka__
           Matthew J. Rinka
           Assistant United States Attorney

**CERTIFICATE OF SERVICE**

      I hereby certify that on July 30, 2020, a copy of the foregoing Government's Motion for Pretrial Detention was filed electronically.   Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system.   Parties may access this filing through the Court's system.

                                                                              S:/Matthew J. Rinka
                                                         Matthew J. Rinka
                                                         Assistant United States Attorney

Office of the United States Attorney
10 West Market Street, Suite 2100
Indianapolis, Indiana 46204-3048
Telephone: 317-226-6333